79 N.J. Super. 221 (1963)
191 A.2d 197
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ANTHONY O. RULLIS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 7, 1963.
Decided May 20, 1963.
*224 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Reginald F. Hopkinson argued the cause for appellant (Messrs. Hofstra & Hofstra, attorneys; Mr. Hopkinson, of counsel).
Mr. Dominick A. Mirabelli argued the cause for respondent (Mr. H. Douglas Stine, Union County Prosecutor, attorney; Mr. Mirabelli, of counsel).
The opinion of the court was delivered by FREUND, J.A.D.
Defendant appeals from a County Court judgment of conviction, after a trial de novo without a jury, "for assault and battery and the use of loud and abusive language in violation of N.J.S. 2A:170-26 and 29 [N.J.S.A.]." This judgment affirmed the conviction entered in the municipal court of the Township of Hillside, N.J.
Preliminarily, we note procedural irregularities in both the municipal and County Court. The municipal court complaint charged defendant in a single count with assault and battery in addition to use of loud and offensive language "in violation of Section 2A:170-26, 29 of the New Jersey Statute." The appendix does not contain the municipal court judgment; however, a reading of the briefs and the findings and judgment of the County Court indicates that the municipal court imposed a single fine of $25 upon defendant for both offenses. The County Court considered only the single complaint containing both charges and reduced the fine to $10.
R.R. 3:4-7 permits two or more offenses relating to "the same or similar character or are based on the same act or *225 transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan" to be charged in the same indictment "in a separate count for each offense." Our rule is a modification of Federal Criminal Rule 8(a). The rationale for this requirement is obvious. Criminal proceedings demand clarity. State v. LaFera, 35 N.J. 75, 81 (1961). As this court noted in State v. Torrance, 41 N.J. Super. 445, 452 (App. Div.), certif. denied 23 N.J. 59 (1956), "[i]t is settled that an indictment [or complaint] containing a single count cannot be utilized for the purpose of joining separate and distinct offenses, even of a like nature." Similarly, a trial court should specify the sentence for each offense charged in an indictment or complaint. State v. Cianci, 18 N.J. 191, 194 (1955), cert. denied 350 U.S. 1000, 76 S.Ct. 555, 100 L.Ed. 864 (1956); State v. Quarto, 44 N.J. Super. 120, 125 (App. Div. 1957), cert. denied 355 U.S. 850, 78 S.Ct. 73, 2 L.Ed.2d 60 (1957). In the present case, defendant has not been prejudiced by these irregularities. He failed to object below to the defective complaint or to the manner in which the fine was imposed. He does not argue these irregularities on appeal. However, we take this opportunity to emphasize that, where two or more separate offenses are incorporated in an indictment or complaint, there should be separate counts for each offense. Where there are separate offenses, the trial judge is required to impose a precise sentence for each offense.
The essential facts of the case are as follows. Defendant described his trade as "a memorialist. We deal in monuments for the deceased families." He is the owner of the property at 1200 North Broad Street, Hillside, where he displays monuments. The property of the complaining witness Herbert F. Jacobi, a retail florist, is adjacent, at 1202-14 North Broad Street. On or near the boundary between these properties, defendant had erected granite posts connected with iron bars or pipes that served as a fence between the two properties.
At approximately 9 A.M. on November 1, 1960 Jacobi and two assistants were removing the granite posts by "breaking *226 them down with a hand crane" and "a sledge hammer." When defendant arrived at his place of business, he saw Jacobi destroying the fence and demanded that the destruction be halted. Jacobi refused, claiming that the granite posts were on his property. Defendant continued to protest that he owned the property upon which the posts were resting. He asked a passing patrolman, Arthur Issler of the Hillside police force, to intervene. Issler testified that he "told him [defendant] that he wouldn't stop him [Jacobi], because the fence posts to me looked like they were well in his [Jacobi's] property, and that he [defendant] consult his lawyer." Defendant rejected this advice to settle his differences peacefully and continued to argue with Jacobi, saying that "he was going to stop Mr. Jacobi himself."
Patrolman Issler testified that in the course of this argument defendant walked onto Jacobi's property, "grabbed his [Jacobi's] clothing and reached down to a bar, and lifted it from the ground." Karl Kohl, one of the workmen assisting Jacobi, testified that defendant "put his hand around the pipe, and the pipe wouldn't move. He let it go. He came up and pushed Mr. Jacobi." Jacobi testified that defendant "struck me on the upper part of the arm" and "with his right hand he [defendant] grabbed me, and then with his left hand he started to pick up an iron post, an iron railing." Jacobi feared that defendant would strike him with the pipe. Consequently, Jacobi "started backing up" and eventually "got away from him." All three witnesses on behalf of the State testified that defendant called Jacobi "a son of a bitch."
Defendant testified that he did not strike Jacobi: "and that's on the law of God, my mother's grave, I did not touch him." In addition, defendant denied describing Jacobi in the vile and indecent language attributed to him by the other three witnesses, although he testified that "I said `leave them damn posts alone,' and I keep raging at him."
Defendant's statements to the contrary notwithstanding, the County Court judge was clearly within the discretion permitted a trier of fact in accepting, as he did, the version *227 of the facts presented by the State's three witnesses  including the testimony of the impartial witness, patrolman Issler. The testimony raised a question of disputed facts for resolution by the trial judge. R.R. 1:5-4(b), 2:5. Cf. Greenfield v. Dusseault, 60 N.J. Super. 436, 444 (App. Div.), affirmed 33 N.J. 78 (1960).
Indeed, defendant does not seriously challenge the credibility of the State's witnesses on this appeal. He instead seeks to minimize the effect of his use of force by commenting that "the testimony reveals nothing more than a very moderate, almost accidental application of force." Defendant admits that "a battery is defined as the slightest corporal touching," as indeed he must. State v. Maier, 13 N.J. 235, 241-42 (1953); cf. Clayton v. New Dreamland Roller Skating Rink, Inc., 14 N.J. Super. 390, 398 (App. Div. 1951), certif. denied 13 N.J. 527 (1953). In addition, the three State's witnesses testified that defendant threatened to strike Jacobi with an iron pipe. The trial judge could find that Jacobi was placed in fear of bodily injury. However, defendant argues that this use of force was privileged because it was employed in the protection of his property.
Preliminarily, in determining the merits of this defense, we note that defendant claims the monuments were personalty and within his possession. We cannot agree with this characterization. "At any particular instant of time every piece of property in the world is either real or personal." 1 Reeves, Real Property, § 9, p. 10 (1909). Certain types of property, other than fixtures, are sometimes realty and sometimes personalty, depending upon the circumstances in which they are found. Thus, fences are "ordinarily a part of the real property to which they are attached." Reeves, supra, § 45, p. 53. See Leo Co. v. Jersey City Bill Printing Co., 78 N.J.L. 150, 151 (Sup. Ct. 1909). "Rails made up into a fence on the land become a part of the realty." 73 C.J.S. Property § 11, p. 180 (1951). As the court commented in Ruckman v. Outwater, 28 N.J.L. 581, 583 (E. & A. 1860), posts or rails
*228 "are personal property as long as they remained in piles or otherwise unappropriated; but as soon as they are converted into fence they become a part of the freehold affixed to it, so as to lose the character of personalty."
Applying these principles to the present case, we find that the granite posts and rails forming a fence were attached to the soil with every indication that their annexation was of a permanent character. The posts were, consequently, part of the disputed realty.
During the trial before the County Court, defendant repeatedly attempted to demonstrate his ownership of the disputed land and the fence. Although the trial judge took some evidence concerning the boundary in order to determine the nature of the dispute and to ascertain the proper penalty, he expressly declined to decide the question of title in this criminal action. For example, during the course of the trial the judge stated:
"You cannot resolve a title, in my view by a fist fight or pipe fight, or even an agrument. * * * once there is a disputed ownership there are Courts to settle it; assault and battery is not the solution. We simply can't live on that solution. * * * I am not concerned, and I cannot be concerned with the soundness or the accuracy of the defendant's view as to who owned the property."
Under the circumstances, the trial judge properly rejected the defense of protection of property and refused to decide the question of title. Even assuming defendant could establish his title to the disputed land, he was not in actual possession of the premises on the morning of the altercation. As noted, Jacobi and his assistants were on the disputed property removing the posts and pipes when defendant arrived.
Although the question has apparently never been decided in New Jersey, we note that the authorities and cases from other jurisdictions suggest that, in order to justify an assault, the possession of the property  in the present instance land  must be actual and not merely constructive. 6 C.J.S. Assault and Battery § 94, p. 951 (1937). The author of the *229 annotation, "Right to use force to obtain possession of real property to which one is entitled," 141 A.L.R. 250, 276 (1942), concluded as follows:
"The cases involving criminal liability for assault committed in regaining possession of land by one entitled thereto are not numerous, but are harmonious in holding that the owner of real property with a right to possession has no right to resort to force in attempting to gain such possession from one wrongfully withholding it."
For instance, in a case factually similar to the present prosecution, the Circuit Court of Appeals affirmed the trial court's refusal to take testimony concerning title to land. Hickey v. United States, 168 F. 536 (9 Cir. 1909). There, defendant struck an individual named Powell with a revolver while attempting forcefully to eject Powell and his associates from a mining claim of which they were in possession. Hickey maintained in his defense to the resultant prosecution for assault and battery that he owned the mining claim and that his previous application to the district attorney for assistance had been denied. In rejecting these contentions, the Circuit Court stated:
"There was manifestly a dispute between the parties about the right of possession as it respects the claim, and the defendant had no right to attempt to settle that dispute by undertaking to eject Powell and his men by physical force, after they had refused to vacate the premises, when so ordered. Even if the defendant were the owner, with a perfect title, he had no legal right to oust trespassers in that way. The law provides peaceable methods for obtaining possession where wrongfully denied, and a resort to force and violence without pursuing the due course of law is seldom excused." (at p. 537)
The court deplored defendant's taking the law into his own hands in these terms:
"There is no warrant of law for such a course of action. It would lead to riot and bloodshed, and make every man the judge of his own property rights and the executioner of his own judgments. A person has a right to defend his domicile or habitation against the intrusion of others, and to apply ample force to remove any such *230 found therein. Long v. People, 102 Ill. 331. And he may prevent trespass upon his lands by force sufficient to repel the same; but, being himself dispossessed, he has no right to recover possession by force and by a breach of the peace. Sampson v. Henry, 11 Pick. (Mass.) 379, 387. The law applicable here is pertinently stated by Pollock, J., in State v. Bradbury, 67 Kan. 808, 809, 74 Pac. 231, 232. He says:
`While one rightfully in possession of property may defend his possession against an attack, and while one lawfully entitled to the possession of real property may, if he can, enter and take peaceable possession, yet, no matter what lawful right to possession one out of the actual possession of real property may have, he will not be justified in making a forcible entry and committing a breach of the peace in ejecting by force an actual occupant.'
It is clear, from the record, that Powell and his men were in possession, and were working there. While the defendant, if in possession, might have kept them out by force, yet, finding them in possession, though trespassers, he could not use force to oust them, because the law provides a more peaceable way for doing it." (at p. 538)
The judgment of conviction was affirmed. Similarly, in the instant case defendant cannot be exonerated because he claimd to own the disputed realty or because he sought unsuccessfully to have law enforcement authorities intervene on his behalf.
In another case involving a boundary controversy, State v. Hazen, 160 Kan. 733, 165 P.2d 234, 240 (Sup. Ct. 1946), defendant threatened to "stomp" the complaining witness "into the ground" because he built a fence in a disputed area. Upholding the conviction for assault, the court stated:
"Nor is the result affected, as is suggested by appellant, because of the fact he thought he was entitled to the use of the premises and was attempting to establish his right to possession thereof. The law recognizes no such unlawful method of testing legal rights." (citing State v. Bradbury, quoted in Hickey above)
See also State v. Carroll, 239 Wis. 625, 2 N.W.2d 211, 213, 141 A.L.R. 244, 247, 248 (Sup. Ct. 1942), in which the court held that
"where one who is not in the actual possession of land, although lawfully entitled thereto, forcibly ejects another who is in peaceable possession thereof, he is criminally liable for the assult [sic]. * * * *231 As the law provides ample redress for the recovery of the possession of property, whether real or personal, and for the recovery of damages for injury sustained by the unlawful withholding of such possession by another, the owner who is not in possession, although lawfully entitled thereto, has no right to attempt to take possession by force; and the law will not justify his resorting to violence and the breach of the public peace in attempting to do so."
Defendant relies upon State v. Ruta, 112 N.J.L. 271 (E. & A. 1934), for the proposition that "a defendant clearly has the right to assert the defense of personalty whether ownership or right to possession of the chattel be in dispute or not." We find Ruta to be factually inapposite. There, the defendant was still in possession of an automobile when he assaulted one McQuaid who was attempting to repossess the automobile under an alleged conditional sales contract. In the instant case, as we have already emphasized, defendant was not in possession of the fence posts at the time he committed the offense upon Jacobi. Even assuming that the posts and pipes were personalty, the applicable principles are those previously enunciated in regard to realty, and were succinctly summarized in Lockland v. State, 73 S.W. 1054, 45 Tex. Cr. R. 87 (Tex. Ct. Crim. App. 1903):
"The law accords one in possession of property the right to protect such possession; but the possession must be actual, and not merely constructive; and when one has parted with the possession of personal property he may not regain it by such means as result in homicide or assault."
From our review of the testimony and the applicable principles of law, we are satisfied that the conviction of defendant for assault and battery was proper.
We proceed to review defendant's arguments for reversal of his conviction for the use of offensive language, N.J.S. 2A:170-29(1), N.J.S.A.:
"Any person who utters loud and offensive or profane or indecent language in any public street or other public place, public conveyance, or place to which the public is invited; * * * Is a disorderly person."
*232 Preliminarily, we dismiss defendant's argument that the statute be strictly construed because it imposes a restriction on his "personal liberty." Obscenity and indecent language are not protected by the constitutional guarantees of free speech. Roth v. U.S., 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, rehearing denied 355 U.S. 852, 78 S.Ct. 82, 2 L.Ed.2d 60 (1957). The statute is a valid exercise of the police power and is not an abridgment of the right of free speech. State v. O'Donnell, 200 A. 739 (Sup. Ct. 1938), (not officially reported).
A threshold question is whether a retail establishment is a "place to which the public is invited" within the purview of the statute. Defendant suggests that the rule of ejusdem generis be applied to limit the scope of the phrase "place to which the public is invited" to apply to only a public street or conveyance. Ejusdem generis is applied to general words used in conjunction with words of specific meaning to limit the scope of the general words to the class expressly mentioned. General Roofing Co. v. Belmar, 77 N.J. Super. 469, 472 (App. Div. 1962). Significantly, the statute mentions "public street or other public place" before the phrase in question. Of course, every phrase of a statute is to be given its full effect, and constructions are to be avoided which render any part of a statute superfluous. Ibid. Ejusdem generis may properly be applied to limit that clause of the statute which provides for "public streets or other public place" not only to any public sidewalk or roadway but also to such public places as a city hall, public library, park and the like. But to interpret the phrase "place to which the public is invited" in the same fashion would render the reference to "other public place" redundant and superfluous. Consequently, the Legislature in using the phrase "or place to which the public is invited" must have meant something more than a general restrictive phrase.
The intended meaning of the phrase "or place to which the public is invited" becomes clear upon a review of the *233 legislative history. The original statute was enacted in 1898 and in pertinent part reads as follows:
"Any person or persons who shall loiter or assemble on the streets, at the corners of the streets, or in the public places of any city, village, borough, or township of this state, * * * shall indulge in and utter loud and offensive or indecent language, or shall address or make audible and offensive remarks or comments upon any person passing along such streets or public places, * * * shall be deemed and adjudged to be a disorderly person." L. 1898, c. 239, § 3, p. 943.
A 1912 amendment made the statute applicable to "any railroad train, trolley car or other public conveyance." L. 1912, c. 114, § 1, p. 161. After reviewing the earlier cases which limited the coverage of the statute, our former Supreme Court held that a saloon was not a public place and therefore not "within the denunciation of the act." State v. Colgan, 92 N.J.L. 307, 308 (Sup. Ct. 1919). In 1924 the Legislature enacted the following amendment:
"Any person who shall loiter in any public place, in any quasi-public place, or in or upon any private property not his or her own within this State * * * shall there indulge in and utter loud and offensive or indecent language, shall be deemed and adjudged a disorderly person." L. 1924, c. 173, p. 385.
Where we seek the meaning of amendatory language, the court "must look to the prior law, the matters deemed to require correction thereunder, and the remedy enacted." Grogan v. DeSapio, 11 N.J. 308, 323 (1953); Grobart v. Grobart, 5 N.J. 161, 166 (1950); 1 Sutherland, Statutory Construction (3d ed. 1943), § 1931, p. 416. Clearly, the purpose of the 1924 amendment was to expand the coverage of the original enactment to cover areas to which the public was invited such as retail establishments.
In the enactment of Title 2 in the Revised Statutes of 1937, the original 1898 section of the statute was separately enacted under the title of Disorderly Persons by R.S. 2:202-7; the 1924 amendment became R.S. 2:202-8. The statute achieved its present form as a result of the 1951 revision, constituting *234 Title 2A. Although counsel has not referred us to any authority, nor have we found any that has interpreted the phrase "or place to which the public is invited," it is apparent that this phrase was substituted for the broad but cumbersome language of the 1924 amendment, subsequently incorporated in R.S. 2:202-8.
Defendant argues that the boundary line at which the language in question was spoken was not a public place within the meaning of the statute. However, both defendant's and Jacobi's properties were retail businesses to which the public is invited. From the photographs received in evidence on behalf of defendant, it is apparent that defendant's yard is a small area with a display of monuments or memorials adjacent to the sidewalk. The public had an implied invitation to inspect defendant's merchandise in the vicinity of the fence and boundary line  the scene of the altercation. So, too, the complaining florist invited the public to attend his business establishment and premises adjacent to defendant's property. Cf. Handleman v. Cox, 39 N.J. 95, 110 (1963).
Nor is the fact that only the complaining witness, his assistants, and patrolman Issler heard the offensive and profane language a valid defense. The offense is the utterance of the language complained of, and defendant is not absolved because more individuals might have heard his exclamations.
Finally, defendant argues that the statute requires that the speech be loud and that there is no proof that his utterance exceeded normal volume. The proofs are to the contrary. Jacobi testified that defendant was "shouting." Defendant himself admitted that he was "raging" at Jacobi.
Affirmed.
FOLEY, J.A.D. (dissenting).
I am unable to agree with that portion of the majority opinion affirming defendant's conviction of uttering loud and offensive language at a "place to which the public is invited." See N.J.S. 2A:170-29(1), N.J.S.A. The place of the occurrence was not a public place in any sense. It was occupied by a retail establishment, *235 entirely private in every respect. If it be assumed that the Legislature recognized that civilly, one operating such an establishment is deemed to extend an implied invitation to the general public to enter upon it to examine, and perhaps to purchase, wares offered for sale thereon, and so intended that uttering the condemned language on such premises should be interdicted by the statute, then, it seems to me, it likewise intended that presence of one of that class of invitees be requisite to proof of the commission of the offense.
The basic objective of the statute is to protect from exposure to offensive language, persons  not places, people  not metes and bounds. The mischief sought to be obviated is, in part, the impact of language, commonly thought to be offensive, upon members of the public at large in other than purely private places at the invitation of one dealing with the public. In my judgment, it is not sufficient that the language be uttered in such a place; additionally, it must appear that the language had the capacity of offending the segment of the public for whose benefit the legislation was enacted.
Those persons present at the time and place of the commission of the alleged offense, in addition to Rullis and Jacobi, were a "couple of workers" employed by Jacobi, and a police officer who was there in discharge of his official duties. Although these men were members of the general public, their invitation to be there did not stem from a customer-shopkeeper relationship upon which the majority predicates its holding that the place was one "to which the public is invited." Thus, as I see it, these persons were not of that class of members of the public the statute was designed to protect.
There is no evidence whatever of the presence of a person impliedly invited to come upon the premises to transact business with the store owner or owners. Indeed, there is no specific proof that either establishment was "open for business" at the time.
For these reasons I conclude that the section of the statute upon which the charge of uttering loud and offensive language is based did not apply to the facts of this case.
*236 I agree with the majority that the conviction of assault and battery is amply supported by the evidence. However, the single count  single sentence procedure, ill-advisedly adopted by the court below, leaves the case in a posture in which it is impossible to determine the basis on which the County Court imposed punishment. I would, therefore, reverse the loud and offensive language conviction, affirm the assault and battery conviction, and remand for the imposition of sentence in light of this result.